The Court of Illinois has reconvened. You may proceed. Our second case of the morning, 415-0284, Ginnopoulos v. Pitaya. Is that how it's pronounced? Correct, yes. Okay, good. For the appellant, Mr. Stromsta. Yes. And for the applicant, Mr. Topp. You may proceed. Thank you. Good morning, Your Honors. Again, my name is John Stromsta, and I represent the appellant, Ted Ginnopoulos. And with the Court's permission, throughout the brief, I used the names Ted and Pitaya for the sake of ease. And with the Court's permission, I would like to continue to do that, just for simplicity's sake. As a matter of introduction, the building at issue here, 625 East Green Street in Champaign, is located in a prime commercial area, just a block from the University of Illinois campus. It's surrounded by a growing, vibrant business community. Unfortunately, the building has stood vacant and unoccupied for over five years now, after a fire in March 2011. And unfortunately, it's not served any one economic value since that time either. Unfortunately also, the judgment of the trial court did not resolve the situation. In fact, I think it advanced the problem. The owner of the building was held to not have a right of possession of the building. The tenant, Pitaya, was found to have the right of possession, but has not paid any rent for the building since November 2011. At which point, Pitaya refused to accept Ted's tender of the keys to the premises after repairs had been made. And the Court and Pitaya both found those repairs to have been inadequate to bring the premises back to the condition it was at the time of the fire. Pitaya argued, and the Court found that the premises were untenable in the state at which they were repaired. Yet at the same time, Pitaya has chosen and elected to exercise its option to renew its lease for the premises. And it's still on the lease for the premises. And apparently at the same time, with no intention of paying rent, it keeps the building vacant and unmarketable. And really this was the product, unfortunately, of a series of mistakes made by the trial court before and during trial. Starting with the failure to proceed with the case as a forcible entry and detainer claim, which was the subject of Ted's first complaint. And not addressing that in a limited and summary fashion, in which such a case should have been considered. And then also not dismissing the Titus counterclaim for damages. It's clear under Illinois law that the trial court was a court of limited jurisdiction for this case. The question was, who is entitled to immediate possession? So what would you do if it was filed in multiple counts? Or it appeared as if the parties were trying to involve other issues into that? Would you proceed with the forcible entry and detainer and give a quick judgment or a more prompt judgment? And then say, later we'll have a trial on those issues? Yes, and in fact, as a matter of fact, I think that the Titus counterclaim for damages, economic damages, including lost profits, clearly under the state of Illinois law for a long time, are not germane to a forcible entry case. This could have been handled in many different ways. In fact, there were other remedies available to the TIA apart from this, in terms of both remedying its situation and also then mitigating the damages it claimed to. But the TIA elected not to do that. The court didn't invoke those or bring those into consideration. But yes, I think that would be the way to go. I mean, the court has to focus on immediate possession of property. What's at issue here? Who's entitled to possession? And this case became a morass, unfortunately, in the consideration, I think primarily, of the claimed damages by the TIA. The court also, I think there were three distinct errors that moved through this case. Well, the first being the forcible entry and detainer action, not granting motions to dismiss. But then also, as the case moved along, the trial court became involved, invoked a first material breach analysis here. But that evolved into three, I think, issues that led to mistakes in the course of the case. One, that the lease required Ted to repair the premises to the condition they were immediately prior to the fire. That Ted's repairs weren't sufficient to meet his duty. And those conclusions were contrary to the term of the lease. The trial court repeatedly says, I'm looking at the lease as a whole. But in fact, and I know we're operating under a manifest error standard here, mistakenly was looking at the lease in fragmented ways. Even though invoking, you know, we're looking at this lease as a whole. It's really not what happened. The second mistake was that the court didn't treat Ted's duty to repair under the lease as separate from, and independent from, the TIA's duty under the lease to pay rent. The law is clear in Illinois in the commercial cases, perhaps different in residential cases, that these are independent issues. And these were unfortunately merged together, even when reading the lease as a whole. And then also the third would be that the appropriate remedy, the court determined the appropriate remedy for the breach of the duty to repair was to allow the TIA to retain possession and yet have no obligation to pay rent. Basically finding that the breach of the duty to repair, the obligation of the duty to repair, because it was breached, trumped the duty to pay rent. Even though the TIA retained possession after the case. And indeed had legal possession of the premises throughout, under the lease, and particularly since November 2011, when the tender of keys were made, yet refused. Because the TIA did not consider those repairs to be sufficient. Indeed in its judgment, the court found that the fire had rendered the property untenable and unusable for its intended purpose. And held that Ted's duty to repair required him to restore the premises to the condition immediately before the fire. That holding required Ted to do more than he was responsible for, under the lease. And also under the law. There's no implied covenant in Illinois, under Illinois law, that a premises will be suited to the tenant's intended purpose. Even in leases that state specific purpose for the premises. Paragraph 8 of the lease says, yeah, it's for the tenant to do that. To make it appropriate for its intended purpose. Had that already happened once? Yes. Then the tenant moved in. Then the tenant moved in. Right. And the lease required Ted to repair the premises it required. Definitely. Paragraph 14. But again, there's no specific language saying it's got to be in precisely that same condition. After the fire, Ted repaired and rebuilt the premises to what's called a vanilla box state. But it was also a little bit more than that. Parties have been meeting and discussing what repairs were necessary. Both, I think, personally and through their lawyers. And the record shows that certain items requested by the TIA, Disabilities Act, sufficient bathroom, bracing for shelving, et cetera, were done by Ted. But having said that, there's no obligation for Ted to perform, to replace everything that's needed for what's referred to in the record as the Pattaya look. Because the lease is silent with regard to repairing the improvements Pattaya made to the premises after the lease term began, and also with regard to preparing the premises specifically for the intended use, the repair work Ted completed satisfied his duty to repair under the Lease to No Living Law. It was the place where a business could move in and bring it back to an operating business. And even if Ted did breach the lease in not bringing it all the way back to the condition it was in precisely at the time of the fire, Pattaya had various alternative remedies, too, under Illinois law, if they were dissatisfied with this. Under Illinois law, they could abandon the premises, terminate the lease. In fact, there's a paragraph, lease paragraph 18, allows them to do just that when there's a breach by the lessor, by Ted. Another option, they could have sued for overpayment of rent. A third, they could have made the repairs themselves. And there's testimony in the record from both Pattaya's president, Mr. Mazur, I believe from Ted, and from other people who are involved in repairs that the costs of these repairs weren't going to be, in a commercial sense, very significant. It talks about $25,000 to $35,000. And so there's that other option. And also they could then sue for breach and claim damages. And that's not measured in terms of lost profits. That's measured in terms of the difference between the value of a premises if it's kept in good repair and the value of a premises in their actual conditions. So it's much different from the counterclaim that was brought for the economic damages. And I think my view of this, my view of the record in this, we said in the brief, this was the economic damages became, the counterclaim became kind of the driving force in the case. And it led to what I think is a result that took a long time coming. And that's still keeping this business, this building empty, serving no economic use to anyone. And in fact, requiring Ted to continue to pay the costs for the building. The court also didn't consider, or found to be actually not applicable, the duty to mitigate damages on this counterclaim. The counterclaim sought over $300,000 for lost profits for the time during the fire. And the court considered those. Going back to the actual day of the fire, not the day the repairs were completed in November and the building was tendered, but going back to actually the day of the fire. So $300,000. Other components of those economic damages brought out to about $350,000. Now that's a factor of, I'm not going to say that correctly. That's ten times more than the estimated cost of making the repairs. That disproportionate amount should have suggested to the trial court that these damages should have been mitigated. There were those four remedies that the Taya could have used in the situation. But persisted with their counterclaim. And really, the court should have, I think, evaluated whether it was right and reasonable for Pattaya to have sat on its hands in this situation and not made those relatively small and inexpensive repairs. Particularly when seeking damages for lost profits in a forcible entry and detainer case. These were avoidable consequences that both the court and Pattaya could have remedied without going this far. Another paragraph for the court to consider, too, is paragraph 14 where all the risks, at the least, all other risks apart from the rebuilding and repairing after a situation like a fire are at the lessee's, at Pattaya's peril, I think is the word. And the example is given as such as business interruption. Well, I think that paragraph really serves to define more clearly what the duty of repair was for Ted. And it was far more limited than what the court found and that Pattaya argued. You know, the court, and doubling back to the reading of the lease as a whole and not bringing, or not considering the duty to pay rent and the duty to repair as separate and independent clauses under the law. I mean, the court really focused on the fact that the building had been totally destroyed. And it was, and that's a quote, totally destroyed. It was severely damaged in that fire, March 23, 2011. But in analyzing, in reasoning for Pattaya to have possession, the court didn't consider that period of repair that was allowed under the lease, six months and more, if reasonably necessary, from the time of the fire. The court looked at things from that time of the fire and not the time of repair. The trial court often referred to, you know, we're not going back to the Mexican restaurant, which occupied the space prior to Ted purchasing it. That wasn't the point. The point of the analysis was where the remedies were, or where the repairs were, as of Ted's efforts six months into it. And also, Pattaya decided not to physically occupy the premises. That doesn't mean that they were not in possession of it. They were certainly in legal possession of this, we argue, as of at least November 11. They were always the tenant from the term of the lease. But this is where they certainly were in legal possession. They had the obligation to pay rent. And the record's undisputed that they have not. This case, it took a long time for a forceful entry case. The court found it as an extraordinary case. And that's another quote, extraordinary. It really isn't in a commercial setting. It's a fire in a commercial building. It's not an extraordinary case. The court got hung up in looking at the claim for damages as, I think if you use the phrase, inherently, or paraphrasing, an inherent part of the claim. And that's where the problem began. So I will stop the argument at this point and pass that along unless there are other questions. I'll wait for a rebuttal. Thank you. Thank you. Mr. Topp? May it please the court? Mr. Stroms? The premises at question in this matter is in an excellent location next to the University of Illinois campus, half a block from Alma Mater, and a great location for Mr. Mazur to operate his clothing business. Unfortunately, the premises burned down. But before the premises burned down, there had been a lease negotiated between Mr. Mazur and Pattaya and Mr. Gianopolis. And if I may just read a couple of provisions of that lease to you that I think are quite appropriate. Paragraph 14 of the lease. Lessor agrees to promptly repair, replace, or rebuild the premises or any portion thereof damaged by fire or any other casualty occurring during the term of the lease and any extension. Clearly the obligation of Mr. Gianopolis to make those repairs. Also part of 14, during the initial term hereof, at lessor's sole cost and expense for the mutual benefit of lessee and lessor, maintain commercial property form insurance, ensuring the building against damage and destruction by fire and other perils in the amount of a full replacement value of the building, as such value may exist from time to time. Paragraph 15, damages to premises. In the event of any damage to or destruction of the premises, the proceeds of all insurance available shall immediately be applied to repair such damage or destruction, and such repair shall be made within 120 days or such further time as may be reasonably necessary. Such damage or destruction shall in no way annul or void the lease. The facts that you will see in the record of this case are that the fire occurred March 23 of 2011. Thereafter, it was Mr. Gianopolis, as the lessor's obligation, to make the necessary repairs. These repairs were supposedly ongoing by Mr. Gianopolis, and come November of 2011, he offered to return the repaired premises to Pattaya. The only problem was that he did not complete the repairs. He did not complete the repairs that were obligated to be performed, in that he returned it to the vanilla box stage that was pre-existing the lease, and it was when it was first taken over at the time that the lease was initiated, it was an old Mexican restaurant. The condition in which Mr. Gianopolis had the building replaced and tendered to Pattaya was not what was anticipated by the terms of the lease, not what was required by the lease, not what the insurance for full replacement value was anticipated by the lease. Consequently, it was not an acceptable condition to Pattaya to accept the premises as tendered. You'll see there's testimony at trial in 2013 going to what was needed in order to put the first floor, just the first floor, into a commercial condition in order to reopen the business. And it was determined there was a witness for Pattaya that maybe $35,000 of additional work needed to be done in order to be able to put this into the proper condition. Mr. Mazur testified that he thought he could probably get that done for even a little bit less than that, maybe $25,000 or $30,000. Mr. Gianopolis' defense was, I don't have any more money. I didn't think it was going to cost this much, although he had the written obligation under the terms of the lease to keep it fully insured for the replacement value, and he didn't do that. So he said that he didn't return it to the condition that it was supposed to be in because he couldn't afford it. The record will also show that after Mr. Gianopolis had paid for repairs, apparently with all of the insurance money, one of the contractors gave him a refund of $24,000, saying that it was less expensive to repair than what we thought, so I'm going to give you back the $24,000. Now, the $24,000 is very close to what the testimony was that it would cost to put the premises back into a tenable condition where Pattaya could have gone in and restarted its business. Mr. Gianopolis chose not to do that. There is argument in the briefs that Pattaya had an obligation to mitigate damages. Why does Pattaya have to go mitigate damages that are there, have not been cured, because Mr. Gianopolis has chosen not to do them? Counsel, it seems like opposing counsel's strongest argument is the fact that this was a forcible entry and detainer, and the notion that really this counterclaim took over the case and it really should have just been about the right to possession, and of course the rent comes into play in that. What's your response? I mean, did the court go too far? Should we have resolved just the forceful entry and detainer aspect of it? Well, if I may address the forceful entry and detainer aspect of it, in a strict FED sense, if somebody said, okay, you've got a fire that destroyed this premises, and the tenant is still required to pay for the rent of the premises, even though that it's been destroyed, and it was not tenable. They couldn't even reside in or operate business in the property. I think that the McArdle case is instructive to this, with McArdle being in a situation where the holding of the appellate court was that you cannot maintain possession and not pay rent. Has your client done that? No. In this situation, he could not maintain possession. It was not tenable. It could not be used. And so the argument would be made that there would be no rent that was owed when it's not in a tenable condition. So was possession turned over to the owner? The owner had access to the property for purposes of repairs from the time of the fire forward. The legal possession of the property was retained by Pattaya, pursuant to the lease, although he did not have actual possession of the property. So the question would be, then, would an FED proceeding require Pattaya to pay rent for a building that could not be occupied and for which there is a contract which states that the lessor is obligated to make repairs? If they are not considered together, the result could be that Mr. Giannopoulos is not required to make any of the repairs that he committed to make under the terms of the contract. Not make the repairs and yet demand that there be rent paid when there's no consideration for that rent. I think it was under the Jack Spring case and maybe under some of the other cases I've cited in my brief, that what you're asking Pattaya to do is to pay out all of this rent for a building that is not even occupiable by Pattaya. And if you're saying, well, why doesn't Pattaya make the repairs, it's not even Pattaya's building. That's why you've got a lease with the owner of the building who retains then the improvements to the premises that are made for that client so that after the Pattaya lease had expired, although it's still ongoing at this time, the owner of the property would still get back that premises and it has been improved and paid for through the rent that was received by Giannopoulos from Pattaya. It's just a problem I really have with a forcible entry detainer action because it seems to me to be so inequitable and that I don't think that the law is or should be, particularly looking at McArdle, that there is an obligation to pay rent when it's not an occupiable premises. And what Justice Garmon said in the McArdle case was, you cannot retain occupancy of the premises and not pay rent when you've got a leaky roof. And I think that what Judge Leonard is saying in this case, this isn't just some leaky roof where you can still occupy the premises, have the use of the premises, and then try to avoid paying rent. That would be inequitable. It would not be consistent with our ideas of the commerce and the landlord-tenant relationship. So what Judge Leonard was saying was that when you've got a situation where you've got a lease that obligates the lessor to have the insurance that would provide the money to make the repairs and the lessor undertakes the obligation to make those repairs, fails to make the repairs, which is a breach of the lease, and then still expect the tenant, under the same instrument, it's the same lease document, expect him to make those repairs that were under the terms of the lessor's obligation to do. It's just very inconsistent. But you mentioned the McArdle case, and of course the City of Chicago cites McArdle for the proposition that the covenant to repair and the covenant to pay rent are separate. Is that correct? That's true under McArdle, yes. And so I'm not quite understanding why your client would not have to pay rent all this time. First of all, Judge Leonard determined that because it was not tenantable, no rent was due. That was in 2013. Go back to 2011. It is correct that Pattaya did not pay rent for the first seven months up through November or so. If there is an independent obligation to pay the rent, even though the premises was not available, then that would have been a breach. In November of 2011, Pattaya paid $28,000 to Gianopolis as the rent for that period of time. But the lease was extended, and there still has not been payment. I mean, the rent is not up to date, am I correct? That's correct. However, under the terms of the lease, Pattaya was supposed to receive a premises that was habitable, that could be used to operate the business. Gianopolis was in breach of the terms of the lease when he failed to make the repairs to the building, which was the obligation of Gianopolis. Without Gianopolis making repairs to the building under the terms of the lease, it would remain in a condition of a gutted building as a result of the fire. When Gianopolis failed to make the repairs to the building as obligated by the terms of the lease, he was in breach of the lease. And when he tendered the building and it wasn't complete and he had the money to complete it, Gianopolis decided on his own not to make those additional repairs that would have obligated Pattaya to retake possession of the premises and continue to pay in rent. So I think for those reasons that when Gianopolis was in breach of the lease for failing to provide tenantable premises, that excused the payment of rent from November of 2011 forward. But even though we know under a myriad of cases the covenants are separate and the failure to repair does not discharge the obligation to pay rent, so didn't Judge Leonard make a decision that was in conflict with the case law? I'm not familiar with many of those cases other than the McArdle case. But one of the problems that I have with the forced penitentiary detainer is that if you just simply ignore the contract that is the basis of the building, landlord and tenant, as to what's the premises, what are the terms, how do you even establish what the rent is, and when that can cavalierly be breached by the landlord and say, hey, just tough, you go ahead and repair the building on your own, just forget what we said in the lease and then try to make the tenant pay for those repairs? Does the tenant have a separate remedy? Well, the tenant would not have a separate remedy to repair the premises that would not be overly expensive to the tenant. For the tenant to make those improvements for the benefit of a real estate that has remained owned by Geonopolis, it would just be, it seems to me contrary to the terms of a written contract, commercial contract between these two parties. What's the purpose of having a lease if you don't follow the terms of the lease? If each party agrees to undertake certain obligations and responsibilities and then once they enter into the lease then they decide they don't like the lease, they don't want to make the repairs, and so now we're going to ignore the lease and I'm just going to rely upon forceful entry and retainer law and make you make the repairs. What happens to the contract? What's the purpose of a contract in a commercial setting if one of the parties could just simply ignore it? If you're going to ignore that lease, then if the contract is ignored, then does Pattaya have any obligation to pay rent at all? Well, your client hasn't been paying rent, right? No, but as a legal matter, could Pattaya have said, like what you're suggesting, you're suggesting that Geonopolis just say, well, I don't want to perform under the contract? No, that's not what I'm suggesting. I'm suggesting this was a forceful entry and detainer action and that perhaps it was inappropriate based on the case law for the court to undertake this counterclaim because they're separate covenants and it doesn't relieve your client of the obligation to pay rent because the repairs weren't made. Well, I just, I don't feel that it's inappropriate for the court to have allowed the counterclaim, which is for the damages that are being sustained as a result of the terms of the lease. The thing that I found hard to understand was why your client extended the lease agreement when he obviously couldn't operate the store in the premises. Why didn't he just go look for other space? This is an excellent location. In addition to that, one would not usually anticipate that someone in Mr. Geonopolis' position would not simply make the repairs he's obligated to make under the terms of the lease, at which point Pattaya could retake possession of the premises and restart his business. It's an optimistic sort of, you know, at some point this building is going to get repaired and I can retake possession. It was a very good business location and a very good business. The reasons for Mr. Geonopolis to not perform his obligations make no sense to me either, but we're left with what we have. You keep saying take possession and I understand what you're saying. He's not utilizing the building for his business, but he has possession and he's not paying rent. He has the legal right to possess the property under the lease and Mr. Geonopolis has the legal obligation to make the repairs. Nothing further. Thank you. Your Honor, it's just maybe three or four points of rebuttal and I'll be brief. The argument that Ted ignored his duties under the lease are belied by the record. The record shows the extent of work he put into the case, or into the premises, I should say. The second floor, the record also shows, as to the second floor, Ted and I and not Mr. Mazur personally, but his lawyer talked about a rent abatement for purposes of getting that second floor done. It didn't happen. As time went by and came closer to the end of the repair period and then the litigation, those discussions ceased. I want to draw a distinction here because I think it might be a little murky right now. The duty to repair and restore is different from the duty to mitigate damages. The duty to mitigate damages is something independent from the lease. It's something that is required of anyone seeking damages. It's their way to minimize the loss. And looking at the $350,000 economic damages judgment and the fraction that it would cost to repair the premises, that disproportionate amount really suggests that there was a duty to mitigate damages and it wasn't followed. The law is clear that even on a breach of a lease covenant, the right to damages for that is conditioned on the tenant making a reasonable effort to minimize loss. So that is just a fixture in this case. And I claim was brought in and took front and center to the force of entry. Counsel cited Jack Spring. Jack Spring is a residential case. There have been subsequent cases from various Illinois courts saying that that is limited to residential cases. A commercial case is something different. The duties are separate and independent for repair and rent. I'm just reviewing my notes. I think that's all I have for right now. I appreciate your attention. I take the matter under advisement and await the readiness of the next case.